## Case No. 4,342.

ELFELT et al. v. SNOW et al.

[2 Sawy. 94;[1] 6 N. B. R. 57.]

Circuit Court, D. Oregon. Oct. 30, 1871.

---

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

David Logan and D. Fredenreich, for plaintiffs.

W. W. Page and Joseph N. Dolph, for defendants.

Before SAWYER, Circuit Judge, and DEADY, District Judge.

BY THE COURT (DEADY, District Judge). Before considering the first ground for a new trial it will be necessary to state the issue between the parties upon which the jury passed. The pleadings substantially admit the making of the note as alleged and that the composition deed was in fact signed by the plaintiffs and others, creditors of the defendants, and delivered to Jessie on November 19, 1866, and that within two weeks thereafter, Snow in pursuance of the terms of said deed, paid plaintiffs forty-five cents on the dollar of the principal of the note, and also a further sum, in pursuance of a private understanding between plaintiffs and Jessie, amounting in the aggregate to $4,000; and that plaintiffs then accepted said sum in full payment and discharge of defendant's note and delivered the same to Snow.

The issue submitted to the jury arose upon the allegation of the replication, to the effect that the execution of the composition deed and the delivery of the note upon the receipt of the $4,000, was procured by the false representations of the defendants as to their means of paying their debts, and that therefore the plaintiffs were not bound thereby.

If the evidence is sufficient to support this allegation the verdict must be correct. It appears from the evidence that prior to July, 1862, Snow and Jessie had been engaged in the business of retail merchants at Lafayette, Oregon, and purchased goods of plaintiffs and their predecessors in business, J. Kohn & Co. About this time Jessie removed to the east of the mountains, in the territory of Washington. Snow continued the business in Lafayette until the spring of 1865, when he sold the stock of goods and six lots in the town, including his store-house, to one Allen for $6,000, for which the latter gave his promissory notes, with a mortgage upon the lots to secure one half of them. Soon after this Snow went east of the mountains, and engaged with Jessie in packing and trading between the upper Columbia and Idaho and Montana. Jessie lived at Walla Walla and Snow appears to have been upon the road and in Montana. In November, 1866, Snow came into Walla Walla, bringing with him $11,664 in gold dust and a

young man by the name of Harris, in whose name he deposited this dust for assay, so as to prevent his creditors, including plaintiffs, from knowing that he had it. Here Snow stopped and sent Jessie forward to Portland to effect a settlement with the Portland creditors. Upon his arrival at Portland, Jessie called upon the plaintiffs, the principal creditors, and entered into negotiations with one of them—Solomon Goldsmith—for a compromise. According to his own testimony, Jessie then represented that Snow and Jessie, or Snow & Co., as they were called, were insolvent. That their assets consisted of only $4,000 in money and a train of mules worth about $3,000; and that with this amount—$7,000—he thought they could pay forty-five cents on the dollar of their indebtedness, excluding accruing interest. That he, Jessie, had about $5,000 worth of individual property, and owed $3,000[2] of individual debts. When asked by Jessie how the proposed settlement would leave Snow, Jessie replied "that he knew but little about Snow's business—that he had some means, and that the property at Lafayette was sold;" to which Goldsmith replied "that he knew about that, that Snow had told him what he sold it for."

According to Goldsmith's testimony, Jessie stated that Snow and Jessie were giving up all their property, and that Jessie did not state that he did not know what property Snow owned individually. But that he informed him about his own individual property, and for that reason no attempt was made to prosecute the action against Jessie.

The result of the negotiation was the execution of the composition deed of November 19, Goldsmith writing it and procuring the other creditors who are parties to it, to sign it. Jessie then returned to Walla Walla, and gave the writing to Snow, who immediately came to Portland, and proceeded to the plaintiff's store with two gold bars, worth about $6,600,[3] where he met Goldsmith and informed him that he was ready to settle upon the terms agreed upon with Jessie. Goldsmith said that in consideration of cash advanced by plaintiffs to defendants, to help get their goods up the Columbia river, Jessie had promised to pay them something more than forty-five cents on the dollar—in all $4,000. With some show of reluctance and surprise, Snow assented to this arrangement. Goldsmith bought the gold bars and retaining $4,000 for the plaintiffs, and the sum due Wasserman & Co., one of the parties to the deed, gave Snow the promissory note and the remainder of the money to pay the other creditors, which he did. Before closing the transaction with Snow, and handing him the note, Goldsmith testifies that he said to him, "Snow, the amount you are paying us is very small, and from the treatment you received from us, we expected you would do better;

but we make this settlement only upon the representation made to us by Jessie, that you are giving up all you have;" and that Snow answered, "Jessie's representations are true; we are giving up all that we have." Goldsmith also testifies that he was aware of the sale of the Lafayette property to Allen, but not of the mortgage by him to Snow: and that he believed from the representations of defendants that Snow was substantially giving up all his property, and that thereby he was induced to settle with them and accept forty-five cents on the dollar as he did.

Alfred E. Elfelt, not one of the plaintiffs, testifies that he was present at the conversation between Goldsmith and Snow, and that it took place as the former states it.

The defendant Snow was examined as a witness for the defense. His account of the transaction, so far as it went, did not differ materially from the foregoing. He stated that he told S. Goldsmith, about the time of the sale to Allen, that he got notes secured by mortgage for the real property in Lafayette, but was not certain that he informed him that he got Allen's notes for the stock of goods. He admitted that at the time the $4,000 was paid, and the note returned, that S. Goldsmith said to him that the amount paid was small, and that the plaintiffs were induced to make the settlement by the representations of Jessie that this was all that Snow & Co. could pay, and that he replied that he presumed that what Jessie said was correct; and also that at the same time he had in his possession of his own property $6,500 in gold bars and dust, which he had brought from Montana, besides being the owner of the train of mules aforesaid, for which he realized $2,100 in cash, and Allen's notes for $6,000, as aforesaid, which were worth $3,000—in all, $11,600 over and above the $7,000 of partnership funds paid to the creditors.

Upon the argument of the motion, the only point urged under this head was, that upon the testimony of Jessie it did not appear that he had made any false representation or fraudulent concealment as to Snow's individual assets, because when asked how the settlement would leave Snow, he replied: "I know but little about Snow's business; he has some means," etc. Upon this answer it is maintained by counsel for defendant that Jessie substantially disclaimed any knowledge of Snow's individual means; and that, therefore, in this respect the plaintiffs made the settlement upon their own knowledge, and not the representations of the defendants. It is admitted that the law applicable to the question was correctly given to the jury as follows:

When a debtor seeks to make a composition of his debts by the payment of a part only of what he owes, he is not bound to make any representations concerning his assets or resources; but he must act in good faith, and if he does make any such representation, either voluntarily or upon the re-

---

[2] [6 N. B. R. 57, gives $4,000.]
[3] [6 N. B. R. 57, gives $6,500.]

quest of his creditor, he must make it truly and completely, or he will be guilty of fraud.

Now, Jessie did not absolutely disclaim all knowledge of Snow's affairs; and under the circumstances the jury was warranted in inferring that he knew quite as much about them as he said he did. He said he knew but little about Snow's business—that he had some means. What was the impression that this remark was calculated to make upon Goldsmith? Certainly not, that while Snow was proposing to compromise his debts at forty-five cents on the dollar of the principal, with the sum of $7,000, he had of his own means, beside this, $11,600 in cash and cash values—enough when put together to have paid all the debts in full and left him at least $2,000 surplus. "Some means" is a relative expression, to be measured by the surrounding circumstances. Ordinarily, when we say that a man has something left after paying his debts or sustaining a loss, we do not mean, nor are we understood as asserting, that he has nearly twice as much left as he paid or lost. When it is said that a debtor will have some means or something left after settling with his creditors at forty-five cents on the dollar, it is necessarily understood that this something or some means is very small in proportion to the amount paid. In this case the aggregate amount paid the creditors was only $7,000, and it could not have been understood by Goldsmith, or any person in like circumstances, that the "some means" which the settlement was to leave Snow with, was more than one or two thousand dollars. The statement then that Snow had only "some means" left of his own, after making this settlement, was under the circumstances, a false representation. Relatively he had much "means."

But this argument assumes that Jessie's testimony was all the evidence before the jury on this point, while the fact is that Goldsmith corroborated by Elfelt, testifies that Jessie said that Snow and Jessie were giving up all their property, except the individual property of the latter. Neither of them state or admit that Jessie said he was ignorant of Snow's business, or that the settlement would leave him with "some means." It was the province of the jury to determine from the testimony of these witnesses what representation Jessie did make. They have found by their verdict that the representation as to Snow's "means" was untrue, and I think they might reasonably have come to the same conclusion upon the testimony of Jessie alone.

Furthermore, the jury were warranted in believing from the conduct and declarations of Snow from the time he left Montana to come to Walla Walla, that he intended to procure a settlement with his creditors for fifty or forty-five cents on the dollar, without reference to his ability to pay more, and that from the time he left the latter place to come to Portland to perform the agreement which his agent had succeeded in obtaining from his creditors, he was conscious that he had obtained by such agreement an unfair advantage over such creditors.

Snow persistently concealed from the plaintiffs that he had in his possession the $6,500 in gold over and above the amount paid the creditors. He brought Harris with him from Montana to Portland as the pretended owner of the treasure he had, for the purpose of deceiving his creditors in that respect. Although he deposited the $6,500 with the plaintiffs immediately on his arrival, and although their house had always been his headquarters in Portland, he did not take the $6,500 there, but took care to keep it out of their sight and knowledge. Now, if Snow honestly believed that the settlement which he had procured was agreed to by the creditors with the understanding, expressed or implied, that he would have $6,500 in cash left, besides the pack train and Allen's notes, he would not have taken this trouble to conceal from them the fact that he had it. His conduct in this respect reasonably admits of the explanation, that he was conscious his creditors had been induced to sign the agreement to take forty-five cents on the dollar, upon the representation or understanding that he was substantially giving up to them all he had individually as well as otherwise. So, when Goldsmith informed him that he was only induced to make this settlement upon the representation of Jessie, that he was giving up all he had, instead of replying, "you are mistaken, you must have misunderstood Jessie. I will have between $11,000 and $12,000 in cash and cash values left," he said that what Jessie said was correct, thereby directly adopting and affirming a representation of his agent which he knew to be grossly false in fact.

It is true that the compromise deed cannot be avoided by the plaintiffs on account of what was said or done by the defendant after it was executed; at least so the court instructed the jury at the request of the defendant. But the conduct and declarations of Snow at the time of making the payment, and receiving the note, after he was informed of the representations upon which the plaintiffs were induced to sign the agreement, are pertinent to show that Snow authorized, intended or contrived that Jessie should make such representations for the purpose of misleading and defrauding the plaintiffs.

Upon a careful consideration of the premises, I am of the opinion that the verdict of the jury upon the issue arising upon the pleadings is supported by the weight of evidence, if indeed there be any to the contrary. In my judgment, the facts and circumstances of the case all tend to prove that the defendant Snow, intending to procure a settlement with his creditors at not to exceed fifty cents on the dollar, did, by

his representations made through Jessie and his own conduct, concealments and declarations, cause the plantiffs to believe that Snow and Jessie could only pay forty-five cents on the dollar of their indebtedness, after deducting the interest due on the same, and did thereby induce the plaintiffs to execute the composition deed, whereby they agreed to receive that sum in full of what was due them.

The remaining grounds of the motion are for alleged errors in law, and will be considered collectively. Upon the argument of this branch of the case, counsel for defendants made two points: 1. That the plaintiffs cannot maintain this action, and the court erred in refusing so to instruct the jury, because the plaintiffs having induced their co-creditors to sign the composition deed, and having received from the defendants in pursuance of a secret agreement to that effect, more than the per centum stipulated in such deed upon their demand, without the knowledge or consent of such creditors, did thereby commit a fraud upon them. 2. That the court erred in instructing the jury to the effect, that Jessie being Snow's agent to negotiate this compromise, if he, through ignorance of the truth, which was known to Snow, made a false representation as to the affairs or pecuniary resources of the latter, Snow is responsible for such representation, the same as if he made it in person.

Two authorities are cited in support of the first proposition; namely, Breck v. Cole, 4 Sandf. 79, and Wood v. Roberts, 3 E. C. L. 411. Neither of these cases are in point. The first was an action brought by a creditor to enforce payment of a note given by his debtor, upon the execution of a composition deed, as a condition of the former's signing the same, for that portion of the debt not provided for in such deed. The court held that the arrangement was void as against the other creditors, upon whom it was a fraud, and also as to the defendant, upon the ground that it was obtained from him by moral duress. Now, in the case at the bar, the plaintiffs are not seeking to enforce or claim the benefit of any secret arrangement with the debtor to the prejudice of their co-creditors in the composition deed, but on the contrary they repudiate the whole transaction as a fraud committed upon them by the defendants. This action is not brought to enforce the composition deed, nor any additional security secretly given to the plaintiffs in connection therewith, but upon the original promise of the defendants contained in this note to J. Kohn & Co.

The case of Wood v. Roberts, supra, was an action by a creditor for a balance of account after having accepted a portion of his demand in pursuance of an arrangement for a composition between the creditors, including himself, and the debtor. There was a verdict for the defendant, the court in-

structing the jury that to allow the plaintiff to recover would be a fraud upon the other creditors who had in pursuance of the composition accepted the partial payment and discharged the defendant. In other words, the court held, as is now well established, that a debt may be discharged by the payment of a smaller sum, where it is made in pursuance of an arrangement to that effect among the creditors and with the debtor; and that therefore such composition and payment thereunder was a bar to an action by the creditor for the remainder of his debt. The reason given by the court—that to allow the creditor to maintain the action for the balance would be a fraud upon the other creditors—is not the one upon which the courts have finally rested the validity and binding force of what are called composition deeds, or compromises between a failing debtor and his creditors. The general rule is, that a simple agreement between a debtor and creditor that the latter will take a sum in payment of his debt less than the amount thereof is a nude pact, and therefore void for want of consideration. But when two or more creditors agree with one another and the debtor to take a part in payment of the whole amount of their several debts, and discharge the debtor from the remainder, it is held that the mutual promises of the creditors to and with one another is a sufficient consideration to support the agreement.

In support of the second proposition as above stated, counsel for defendant maintains that Snow is not liable for the misrepresentations of Jessie, unless it appears that he expressly authorized or was cognizant of them, or they were brought to his knowledge before the payment of the money and the delivery of the note.

The latter alternative of this argument admits too much for this motion, because, as has been shown, the evidence warrants the conclusion, and justified the jury in finding that Snow was aware of Jessie's misrepresentations concerning his "means," at least before he paid plaintiffs the money and received his note. In support of the position that Snow is not liable for Jessie's representations unless he expressly authorized them, counsel cited Chit. Cont. 679, where it is said that "the mere fact that an agent having innocently made a misrepresentation of facts while effecting a contract for his principal, will not amount to fraud on the part of the latter, if the principal, though aware of the real state of the facts, was not cognizant of the misrepresentation being made, nor ever directed the agent to make it." Chitty cites Cornfoot v. Fowke, 6 Mees. & W. 358, which he states to have been an action for the nonperformance of a written agreement to take a ready furnished house. The defense was fraud on the part of the plaintiff. The facts were, that one Clarke, the agent of the plaintiff, let the house to the defendant, and that

while the parties were making the bargain, the defendant asked Clarke if there was any objection to the house, to which the latter answered there was not, whereupon the defendant signed the agreement. Afterwards he discovered that the adjoining house was a brothel, and on that ground refused to fulfill the contract. It also appeared that the plaintiff knew of the existence of the brothel, but that the agent did not. The court held that the facts did not establish fraud on the part of the plaintiff—the chief baron, Lord Abinger, dissenting. In my judgment, the law of this case is doubtful; but be that as it may, the case itself is very different from the one at bar. That was a case of a misrepresentation by one of two strangers dealing with each other at arm's length, about a matter which, so far as appears, was equally open to the observation of both of them.

The case at bar arises between a creditor and debtor. The latter is seeking a discharge from his debts upon the payment of forty-five cents on the dollar, on the ground that he was unable to pay more. In such case, the law very properly requires the utmost good faith on the part of the debtor. Here, Snow asked to be discharged from fifty-five per centum of debts for which he was individually liable. It was natural and reasonable that the creditors should want to know what condition the proposed settlement would leave him in individually. Under these circumstances, Jessie comes to the creditors to see what can be done. He was Snow's agent in this matter in a double sense: (1) By reason of their being partners; and (2) because Snow had specially authorized and requested him to negotiate this compromise with the creditors, while he practically remained without their reach, at Walla Walla. Snow spoke through Jessie, and it was his business to inform Jessie of the true condition of his affairs, so that he could speak truly, if he spoke at all. If he omitted to do so either from negligence or design, and the agent made false representations concerning his means which misled the plaintiffs to their injury, he is responsible for it, the same as if he made them in person. Snow cannot be allowed to have the benefit of a composition with his creditors which was confessedly procured by the false representations of his agent, upon the ground that the agent was ignorant of the truth, and made the representation in good faith. If such were the law, dishonest debtors could cheat and deceive their creditors with impunity, by means of honest but conveniently ignorant agents. Under the head of "Fraudulent Concealment," it is laid down in Add. Cont. 130, that, "If a debtor induces his creditors to compound their claims and execute a deed of composition for their several debts, by concealing from them the true state of his affairs, and withholding information which ought, in good faith, to have been afforded, the deed will be void, and the creditors will be remitted to their original rights, and will be entitled to sue for the full amount of their several debts;" also (page 634), "If a principal * * * purposely employs an agent ignorant of the truth, in order that such agent may innocently make a false statement, believing it to be true, and may so deceive the party with whom he was dealing; * * * he would be guilty of fraud."

In Stafford v. Bacon, 1 Hill, 535, Mr. Justice Cowan says: "The duty of a debtor who comes for a discharge on part payment, is clear. If he willfully misrepresent or suppress any material fact in the statement of his affairs the accord and satisfaction are void."

In 1 Pars. Cont. 63, it is said, that, "Though there be no actual fraud on the part of the agent, yet if he makes a false representation as to a matter peculiarly within his own knowledge or that of his principal, and thereby gets a better bargain for his principal, such principal, although innocent, cannot take the benefit of the transaction."

In Chit. Cont. 687, it is said, that, "If it appear that there has been a willful withholding by the debtor of information respecting his estate, it will avoid the composition, and remit the creditor to his right to sue for the whole."

In the light of these authorities, as well as upon the reason of the matter, there can be no doubt but that Snow is responsible for Jessie's misrepresentations, though innocently made and without his knowledge. There is no error in the charge of the court on this point.

Indeed, after long and careful consideration, it appears to me, both upon the law and the facts, that this verdict is not only a just determination of the controversy between the parties to this action, but that its effects will be wholesome and promotive of good morals in the community upon the subject of contracts for the composition of debts between debtor and creditor.

The motion for a new trial must be overruled, and the plaintiffs have judgment upon the verdict.